UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

ANEITA HENRY-LEE,                    :

                Plaintiff,     :

       - against -           :

THE CITY OF NEW YORK <u>et al.</u>,      :

          Defendants.    :

- - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: 08 Civ. 0089
DATE FILED: 9/30/2010

**OPINION**

08 Civ. 0089 (DC)

**APPEARANCES:**   (See last page)

**CHIN, Circuit Judge**

      Plaintiff Aneita Henry-Lee brings this action as Administratrix of the estate of her son Peter Lee.  In the early-morning hours of January 4, 2006, defendant Michael Ingram, an off-duty New York City Police Department ("NYPD") sergeant, shot and killed Lee outside of Rory Dolan's Bar and Restaurant ("Rory Dolan's") in Yonkers, New York.  Plaintiff alleges that the shooting of her son was unjustified and asserts civil rights and other causes of action against Ingram, two other NYPD officers, and the City of New York (the "New York City Defendants").  Plaintiff further alleges that defendant JMR Rest. Corp. ("JMR"), the proprietor of Rory Dolan's, and defendant City of Yonkers are also liable for her son's death.  All defendants move for summary judgment.

Defendants' motion is granted.  Lee's death was tragic, but on the facts before the Court, construed in the light most favorable to plaintiff, no reasonable jury could find that any defendant was liable.  Accordingly, judgment will be entered dismissing the amended complaint in all respects.

## BACKGROUND

### A.  Facts

On a motion for summary judgment, the Court construes the evidence in the light most favorable to the non-moving party. The following facts are drawn from the deposition transcripts, affidavits, declarations, and exhibits submitted by the parties. Certain undisputed facts are drawn from the parties' Rule 56.1 statements.

On the evening of January 3, 2006, defendants John Baumeister and Kevin Roughneen, police officers[1] in the NYPD Bronx Anti-Crime unit, worked a shift ending at approximately 2:05 AM on January 4.  (NYC 56.1 Statement ¶¶ 1, 3; Pl.'s Response to NYC 56.1 Statement ¶¶ 1, 3).  That evening Ingram also worked a shift, which ended at about 2:15 AM.  (NYC 56.1 Statement ¶ 2; Pl.'s Response to NYC 56.1 Statement ¶ 2).  Then,

---

[1] This opinion will refer to Baumeister, Roughneen, and Ingram by their rank as of January 3, 2006.

Baumeister, Roughneen, and Ingram (the "Defendant Officers")
drove in separate cars to Rory Dolan's in Yonkers.  (NYC 56.1
Statement ¶ 5; Pl.'s Response to NYC 56.1 Statement ¶ 5).
Baumeister and Ingram were carrying their authorized off-duty
firearms when they entered Rory Dolan's.  (NYC 56.1 Statement ¶
2; Pl.'s Response to NYC 56.1 Statement ¶ 2; Baumeister Dep. 84-
86; Ingram Decl. ¶ 3).  Roughneen was not armed.  (Roughneen Dep.
121:14-17).  The three officers were in plain clothes and neither
their guns nor badges were visible.  (See Adam Decl. Ex. I
("Video")).[2]

        The main entrance to Rory Dolan's is located on the far
right of the building's facade, from the perspective of the
street.  (JMR 56.1 Statement ¶ 59; Pl.'s Response to JMR 56.1
Statement ¶ 59).  There is an additional "exit door" from the bar

---

        [2]  The Video is a version of the January 4, 2010,
surveillance footage from Rory Dolan's.  New York City Defendants
argue that the Court should not consider the Video, arguing that
plaintiff "failed to submit any affidavit authenticating the CD-
ROM, or attesting to when it was created and what footage, if
any, was deleted from the original hard drive."  (NYC Reply Mem.
4).  For the purposes of this motion, defendants' objection is
overruled.  Throughout this opinion, when I refer to the Video, I
refer to the time stamp that appears in the upper-right corner of
the screen.  This time stamp, however, does not correspond to the
actual time of the events occurring in the Video.

area[3] located on the facade about forty feet to the left of the main entrance, from the perspective of the street. (JMR 56.1 Statement ¶ 61; Pl.'s Response to JMR 56.1 Statement ¶ 61). Separating the bar area from the main entrance's exterior door are a five-feet by five-feet vestibule and an interior door. (JMR 56.1 Statement ¶ 62; Pl.'s Response to JMR 56.1 Statement ¶ 62). The main interior door is located in the front-right corner of the bar area. (JMR 56.1 Statement ¶¶ 59, 62; Pl.'s Response to JMR 56.1 Statement ¶¶ 59, 62). The central fixture of the bar area is the bar, the sides of which are 101 feet long and run perpendicular to the front of the building. (JMR 56.1 Statement ¶ 62; Pl.'s Response to JMR 56.1 Statement ¶ 62; Video). Behind the bar, in the bartender work area, are two islands with liquor bottles and cash registers. (Dolan Dep. 154:4-5; NYC 56.1 Statement ¶ 9; Pl.'s Response to NYC 56.1 Statement ¶ 9; Video). The only break in the bar is a sixteen-inch walk-through, which is located on the short side of the bar at the back of the bar area. (Dolan Dep. 154:4-155:12). The restrooms are near the back of the bar. (Dolan Dep. 154:11-18).

---

[3] For clarity, this opinion will refer to the wooden, rectangular bar as the "bar," and the room in which the bar is located as the "bar area."

Upon arriving at Rory Dolan's, the Defendant Officers met their friend Jennifer Bradley and Bradley's roommate, Ashley Warrington. (Bradley Dep. 8-10, 40:13-18; Baumeister Dep. 81:8-9, 150:22-151:3). The Defendant Officers took a seat with Bradley, Warrington, and Sara (a friend of Warrington)[4] on the long side of the bar closest to the vestibule, that is, on the right side of the bar. (Video 11:55:58; Baumeister Dep. 72:7-10; Bradley Dep. 8-9). There were approximately ten to fifteen people in Rory Dolan's at the time. (NYC 56.1 Statement ¶ 11; Pl.'s Response to NYC 56.1 Statement ¶ 11).

Approximately eighteen minutes after the Defendant Officers arrived at Rory Dolan's, Michael Castaldo and Joseph McAllister arrived and took a seat at the bar opposite where the Defendant Officers were sitting. (Video 12:14:00). Castaldo and McAllister had met just a few minutes earlier when Castaldo hailed McAllister's cab. (Castaldo Dep. 10:23-11:13; McAllister Statement 1-2). Castaldo was visibly intoxicated when he arrived at Rory Dolan's. (NYC 56.1 Statement ¶ 13; Pl.'s Response to NYC

---

[4] Sara left the bar about fifteen minutes prior to the altercation between the Defendant Officers and Lee, and was in the bar area with Lee for only a few minutes. (Video 12:28:25-12:31:08). It appears that Sara was neither deposed nor interviewed by the police.

- 5 -

56.1 Statement ¶ 13). Approximately six minutes after arriving, Castaldo approached the Defendant Officers' group and briefly flirted with Warrington and Bradley. (Baumeister Dep. 97:16-22; Video 12:20:05-12:20:38). After sitting on the left side of the bar for about five minutes, Castaldo exited Rory Dolan's with McAllister to have a cigarette (NYC 56.1 Statement ¶ 14; Pl.'s Response to NYC 56.1 Statement ¶ 14; Video 12:25:04). Shortly thereafter, Bradley also exited through the vestibule to have a cigarette. (NYC 56.1 Statement ¶ 15; Pl.'s Response to NYC 56.1 Statement ¶ 15; Video 12:26:05).

While outside, Castaldo met Lee, who was walking by. (NYC 56.1 Statement ¶ 14; Pl.'s Response to NYC 56.1 Statement ¶ 14; Castaldo Dep. 11:17; Bradley 13:10-18). Lee and Castaldo had never met. (NYC 56.1 Statement ¶ 17; Pl.'s Response to NYC 56.1 Statement ¶ 17). They had a brief argument, but they laughed and made up, and Castaldo invited Lee into Rory Dolan's for a drink. (Bradley Dep. 14:9-15:1; Castaldo Dep. 12:7-11; McAllister Statement 2). Lee accepted the invitation, and Lee and Castaldo entered Rory Dolan's together. (Video 12:28:25; Baumeister Dep. 105:13-106:11, 112:23-113:5; Bradley Dep. 15:13-18; Castaldo Dep. 13:25-14:2). Lee had a "no-nonsense, no-kidding-around look" when he entered the bar, like he wanted to "present himself as a

- 6 -

tough guy."[5]  (Castaldo Dep. 12:19-21, 13:12-14).  After

witnessing the interaction between Lee and Castaldo outside the

bar, Bradley returned to her seat on the right side of the bar.[6]

Upon sitting down with Lee on the left side of the bar,

Castaldo bought Lee several drinks.  (NYC 56.1 Statement ¶ 22;

Pl.'s Response to NYC 56.1 Statement ¶ 22).  While sitting at the

bar, Castaldo reached over to hug Lee on several occasions, but

Lee pushed him away.  (Video 12:36:25-12:39:43).[7]

---

[5]  In her deposition, Bradley describes Lee as "a very angry man."  (Bradley Dep. 14:9-11).  In his statement to the police, Castaldo confirmed this account, but he took a more moderate view in his deposition.  (Compare Castaldo Statement 1 ("[Lee] seemed to be in an angry mood."), with Castaldo Dep. 12:19-21 ("I wouldn't say angry, I wouldn't say mad; just, you know, like a firm, no-kidding-around sense.")).  Because I must construe all evidence in the light most favorable to the plaintiff, Castaldo's later account is adopted here.

[6]  In her deposition, Bradley states that she returned to the bar prior to Castaldo and Lee.  (Bradley Dep. 15:4-22).  The security footage, however, shows Bradley returning to her seat about twenty seconds after Castaldo and Lee.  (Video 12:28:25-12:28:42).

[7]  Both in Castaldo's deposition and in his statement to the police, Castaldo states that he and Lee went to the bathroom while in Rory Dolan's, at which time Lee pulled up his shirt to display a knife in his waistband.  The Video, however, does not show Lee enter the bathroom while in Rory Dolan's.  Thus, for the purpose of summary judgment, I will presume that Lee never displayed his knife to Castaldo.

Though the witnesses' descriptions of Castaldo's and Lee's behavior while inside the bar differ in specificity and with regard to some details, they uniformly describe Castaldo's and Lee's behavior as disruptive.  Baumeister and Roughneen report that at one point, Castaldo, with either Lee or McAllister, walked up to the Defendant Officers' party and said something to the effect that "we should bust their heads . . . and take their girls."  (Baumeister Dep. 120:3-8; Roughneen Dep. 139:17-21).[8]  Bradley reports that Lee and Castaldo approached her and Warrington at one point and looked them up and down, while Lee muttered under his breath in a "derogatory" way.  (Bradley Dep. 19:1-20:4).  Bartender Alan Slattery largely confirms Bradley's account.  (Slattery Statement 1 ("[Castaldo] and [Lee] were walking around the bar and bothering people.  The two guys looked like they were checking out the cops or something.")).  The other bartender, Stephen Hughes, did not see Lee walking around the bar, but describes Castaldo as making "sexual comments" that were "[d]emeaning to a girl."  (Hughes Dep. 109:4-7).  The accounts of several other witnesses are

---

[8]  Baumeister states that either Lee or Castaldo made the comment when they walked near the officers.  (Baumeister Dep. 120:3-8).  Roughneen states that Castaldo made the comment, accompanied by McAllister.  (Roughneen Dep. 139:12-141:17).

similar.  (Cassidy Statement 1 ("[Castaldo] and [Lee] went over
to this crowd.  I could see that there might be trouble just by
the way [they] were looking at the girls who were with this crowd
of guys."); Ronan Statement 1 ("[Castaldo] was walking around the
bar giving everybody a hard time. . . . I first saw [him] trying
to talk to a really tall white girl.  It was obvious that the
girl did not want to talk to him."); Warrington Statement 1
("[Castaldo] made some vulgar gestures with his tongue towards
Jen.")).

> The Video confirms Bradley's account that both Lee and
Castaldo approached the Defendant Officers' party.  In the Video,
Castaldo and Lee, after being in Rory Dolan's for just over ten
minutes, walk around the back of the bar and toward the Defendant
Officers' party.  (Video 12:40:43-12:41:42).  After walking a few
feet past the officers, Lee and Castaldo stop and stare at the
Defendant Officers' party for about twenty seconds.  (Video
12:41:09-12:41:28).  They then return to their seats.  (Video
12:41:28-12:41:42).

> As relayed by Hughes, when Castaldo and Lee returned to
their seats on the left side of the bar, they "shout[ed]
obscenities" for "a few minutes" at the Defendant Officers, who
remained seated on the right side of the bar.  (Hughes Dep.

- 9 -

124:5-7, 12-14).  Both Baumeister and Bradley recall hearing Lee yell something similar to "what the fuck" from across the bar. (Baumeister Dep. 158:16-159:9; Bradley Dep. 19:20-21:16, 22:13-18).  In his statement to the Yonkers police, Castaldo stated that "[Lee] was cursing at people all around him, girls too," but Castaldo did not have an independent recollection of Lee's cursing by the time of his deposition.  (Castaldo Statement 2; see Castaldo Dep. 21:11-13 ("Q.  Was the black gentleman cursing at anybody that you saw?  A.  I don't remember.")).[9]  A few minutes after Lee and Castaldo returned to their seats on the left side of the bar, Slattery told Lee and Castaldo that they would have to leave Rory Dolan's.  He did this both by asking McAllister to convince them to leave and by directly asking them to leave.  (Baumeister Dep. 165-67; Hughes Dep. 133:5-135:6; Castaldo Dep. 21:24-22:5; Castaldo Statement 2 ("After a while [Lee] got the bartender so upset that he, the bartender[,] told me that me and [Lee] had to leave the bar.")).

---

[9]  Castaldo gave a statement, which he signed, on January 4, 2006.  The statement is in the record.  At his deposition taken over three years later, he acknowledged that his recollection was much less clear.  (E.g., Castaldo Dep. 9:13-16, 25:7-17).  He did, however, confirm that the statement was truthful.  (Castaldo Dep. 4:25-9:16).  In this opinion, the Court relies on Castaldo's testimony and statement only to the extent they are not disputed by any contrary evidence.

The Video reflects the sequence of events after Slattery asked Castaldo and Lee to leave as follows: Castaldo pays the bill while McAllister and Lee wait a few feet back from the left side of the bar. (Video 12:46:00; Hughes Dep. 135:2-18). With Lee in the lead, the three begin to walk toward the front-left corner of the bar. (Video 12:46:17). Simultaneously, the Defendant Officers stand up but remain near their chairs. (Video 12:46:17). As Lee turns left around the front-left corner of the bar, Slattery walks along the interior of the right side of the bar towards the bar's front-right corner. (Video 12:46:18-12:46:23). As Lee, Castaldo, and McAllister walk along the front of the bar toward the vestibule, the Defendant Officers remain standing but stationary. (Video 12:46:17-25). Approximately when Lee, Castaldo, and McAllister pass the front-right corner of the bar, one of the officers takes a few steps toward the vestibule. (Video 12:46:25). This officer disappears from the frame near the main interior door right behind Lee, Castaldo, and McAllister. (Video 12:46:34). The other two officers follow closely behind. (Video 12:46:35). At this time, both bartenders can be seen behind the bar moving toward the walk-through at the back of the bar. Slattery is the first bartender to exit through the back of the bar and runs along the

- 11 -

right side of the bar area toward the main interior door,
disappearing from the Video's frame about five seconds after the
last officer.  (Video 12:46:36-41).  Hughes walks behind
Slattery, exiting frame near the main interior door approximately
six seconds after Slattery.  (Video 12:46:47).

    The depositions and statements of those in Rory Dolan's
further illuminate the final moments in the bar area.  Several
witnesses state that Lee was yelling at the Defendant Officers
and/or bartenders as he walked out the door.  (Baumeister Dep.
203:13-204:18 (describing Lee as "talking aggressively"); Hughes
Dep. 138:7-14 ("Before [Castaldo] and [Lee] came to the vestibule
to go out the main door[,] [t]hey turned around and started
shouting abuse again at [Warrington] and her friends."); Castaldo
Statement ("When I walked out of the Bar, [Lee] was yelling at
the bartender."); McAllister Statement 2 (stating that Lee yelled
"Let's fight outside").[10]

    Though the precise sequence of events is unclear, all
agree that a physical altercation that began in the vestibule
spilled out onto the sidewalk.  (Baumeister Dep. 215-16).

_____

    [10]  At the time of his deposition, Castaldo did not have an
independent recollection of Lee yelling anything as they exited
the bar area.  (Castaldo Dep. 23:7-20).

According to Roughneen, Castaldo started the physical altercation by throwing a punch at Roughneen; Roughneen responded by pushing Castaldo hard.  (Roughneen Dep. 234-36).  Shortly thereafter, Baumeister claims, Lee threw a punch at him.  (Baumeister Dep. 211:14-20).  Several witnesses state that once Castaldo, Lee, and the Defendant Officers poured out onto the sidewalk, at least one of the Defendant Officers identified himself as a police officer. (Baumeister Dep. 218:7-13; Hughes Dep. 200:12-201:10 ("In response [the Defendant Officers] were shouting 'Stop it.  Stop it.  We're cops.  We're cops.'"); Hughes Statement 2 ("I heard several of [Warrington]'s friends saying they were cops."); McAllister Statement 2 ("I heard the white guy say that he was a cop." )).  No witnesses deny that the Defendant Officers identified themselves as police.

Roughneen was able to quickly bring Castaldo to the ground, and Castaldo remembers almost nothing about the events that unfolded outside of Rory Dolan's.  (Castaldo Dep. 25:18-22; Roughneen Dep. 234-36).  While Roughneen was attending to Castaldo, Baumeister and Lee began fighting.  (Baumeister Dep. 215-16, 238, 240-41; Hughes Dep. 198-200).  Ingram initially thought that Lee was punching Baumeister, but soon realized that Lee was stabbing Baumeister with a knife.  (Ingram Decl. ¶¶ 6-7).

- 13 -

At this point, Ingram warned Baumeister that Lee had a knife and began to run towards Lee and Baumeister. (Baumeister Dep. 243:17-22; Ingram Decl. ¶¶ 8). Baumeister pushed Lee away and began to reach for his gun, which was in a holster inside his pants, but he fell to the ground in the process. (Baumeister Dep. 243-44). While Baumeister was on the ground, Ingram identified himself as a police officer and told Lee to put down the knife. (Ingram Decl. ¶ 11; see Roughneen Dep. 258:4-11 ("I know [Ingram] yelled 'police,' and I believe it was 'don't move.'")). Lee then stabbed Baumeister in the back while Baumeister was on the ground. (Id. ¶ 12).

Ingram drew his gun and again identified himself as a police officer. (Id. ¶ 13). Lee then turned towards Ingram; Ingram ordered Lee to drop the knife. (Roughneen Dep. 255:8-256:3, 256:21-23; Ingram Decl. ¶ 12). Lee took one or two steps toward Ingram, and Ingram fired a single shot. (Roughneen Dep. 260:6-11, 261:13-15; Ingram Decl. ¶ 14). Lee turned and began to move toward Baumeister. (Baumeister Dep. 244:8-14; Roughneen Dep. 260:12-13; Ingram Decl. ¶ 15). Ingram moved closer and fired a second shot. (Roughneen Dep. 261-62; Ingram Decl. ¶ 16). Lee ran past Baumeister and across McLean Avenue before collapsing into a parked car. (Baumeister Dep. 244:14-21;

- 14 -

Roughneen Dep. 262-63; Ingram Decl. ¶¶ 16-17).  Baumeister ran

toward where Lee had fallen and kicked the knife out of his hand.

(Baumeister Dep. 244:15-25).

Ingram called 911 from his cell phone.  (Ingram Decl. ¶

18).  Within minutes of Ingram's call, Yonkers police officers

and an ambulance arrived.  (Baumeister Dep. 245-46).  Baumeister

was taken to the hospital where he was treated for three stab

wounds.  (Baumeister Dep. 246).  As a result of his gunshot

wounds -- one to the neck and one to the back -- Lee died at the

scene.  (Ex. M to Larkin Decl.).

B.  **Prior Proceedings**

Plaintiff commenced this action by filing a summons and

complaint on January 4, 2008.  The City of Yonkers answered on

January 30, 2008.  The New York City Defendants answered on April

4, 2008.  On May 6, 2008, this Court accepted JMR's untimely

answer and denied plaintiff's motion for a default judgment.

Plaintiff later filed an amended complaint on May 5, 2009, with

leave of the Court.

The amended complaint asserts eighteen causes of

action, as follows: as to Defendant Officers: (1) excessive force

under the Fourth Amendment and New York assault and battery; (2)

negligent use of force; (3) negligent failure to intervene to

prevent JMR's agents from serving alcohol to Lee; and (4) failure
to intervene to prevent the violation of Lee's Fourth Amendment
rights; as to the City of New York: (1) negligent hiring,
training, and retention; (2) civil conspiracy; and (3) a <u>Monell</u>
claim;[11] as to the City of Yonkers: (1) negligent failure to
abate a public nuisance; (2) negligent failure to intervene to
prevent JMR's agents from serving alcohol to Lee; (3) failure to
intervene to prevent the violation of Lee's Fourth Amendment
rights; and (4) negligent hiring, training, and retention; and,
finally, as to JMR: (1) dram shop claims; (2) negligent security
claims; and (3) punitive damages.

Throughout the course of discovery, this Court was
called upon many times to resolve discovery disputes.  The
discovery deadline was extended several times, as a consequence
of which the parties had more than twenty months in which to
conduct discovery.  By this Court's order of September 11, 2009,
I held the parties to a previously imposed discovery deadline of

---

[11]  Plaintiff names the "New York City Police Department" as
a defendant in the complaint.  Under New York law, however, "a
department of a municipal entity is merely a subdivision of the
municipality and has no separate legal existence."  <u>Hoisington v.
Cnty. of Sullivan</u>, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999).
Thus, the New York Police Department is not a separate legal
entity capable of being sued.

September 25, 2009.  In that order, I also set a briefing
schedule for motions for summary judgment and instructed the
parties that they could raise any complaints regarding discovery
in the summary judgment papers.

These motions followed.

## DISCUSSION

**A.   Summary Judgment Standard**

The standards governing motions for summary judgment
are well-settled.  A court may grant summary judgment only where
there is no genuine issue of material fact and the moving party
is therefore entitled to judgment as a matter of law.  See Fed R.
Civ. P. 56(c); accord Matsushita Elec. Indus. Co. v. Zenith Radio
Corp., 475 U.S. 574, 585-87 (1986).  Summary judgment must be
denied "if the evidence is such that a reasonable jury could
return a verdict in favor" of the non-moving party.  See NetJets
Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 178-79 (2d
Cir. 2008).

In deciding a motion for summary judgment, the Court
must construe the evidence in the light most favorable to the
non-moving party and draw all reasonable inferences in the
non-moving party's favor.  In re "Agent Orange" Prod. Liab.
Litig., 517 F.3d 76, 87 (2d Cir. 2008).  The non-moving party

- 17 -

cannot, however, "escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (internal citations and quotations omitted).

In deciding a motion for summary judgment, the role of the Court is not to ask whether "the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Because the Court's role is limited in this respect, it may not make factual findings, determine credibility of witnesses, or weigh evidence. See Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005); Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996); United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994).

B. **Claims Against The City of New York, Michael Ingram, John Baumeister, and Kevin Roughneen**

　　1. **Excessive Force Claim**

Henry-Lee alleges that the Defendant Officers used excessive force against Lee, causing his death. The New York City Defendants argue that Henry-Lee's excessive force claims

- 18 -

should be dismissed because (1) Sergeant Ingram did not use excessive force, as a matter of law; (2) Ingram is entitled to qualified immunity, as a matter of law; (3) and neither Baumeister nor Roughneen was involved in the alleged excessive force against Lee.  Plaintiff claims that the Defendant Officers unjustifiably accosted Lee, and fabricated a rationale for doing so, thereby violating his clearly established Fourth Amendment Rights.

> (a)  <u>Applicable Law</u>

An officer's use of force is constitutionally excessive within the meaning of the Fourth Amendment when the officer's actions were "objectively unreasonable in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation."  <u>Maxwell v. City of New York</u>, 380 F.3d 106, 108 (2d Cir. 2004) (internal quotation marks omitted).  In the deadly force context, an officer's use force is "objectively reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."[12]  <u>Nimely v.</u>

---

[12]  New York City Defendants argue that the Defendant Officers are entitled to qualified immunity.  Qualified immunity protects officers who violate constitutional rights that were not clearly established at the time of the police action.  <u>Harlow v.</u>

<u>City of New York</u>, 414 F.3d 381, 390 (2d Cir. 2005) (internal

quotation marks omitted).  The reasonableness of the officer's

decision to employ deadly force "depends only upon the officer's

knowledge of circumstances immediately prior to and at the moment

that he made the split-second decision to employ deadly force."

<u>Id.</u> (internal quotation marks omitted).

An excessive force suit predicated on the use of deadly

force poses a "difficult problem" upon summary judgment because

the person most likely to contradict the police officer's story

is the unavailable decedent.  <u>O'Bert ex rel. Estate of O'Bert v.</u>

<u>Vargo</u>, 331 F.3d 29, 37 (2d Cir. 2003).  Thus, "the court may not

simply accept what may be a self-serving account by the police

officer."  <u>Id.</u>  (internal quotation marks omitted).  Instead, it

"must also consider 'circumstantial evidence that, if believed,

would tend to discredit the police officer's story, and consider

_____

<u>Fitzgerald</u>, 457 U.S. 800, 818 (1982).  "The right to be free of
excessive force is clearly established."  <u>Salim v. Proulx</u>, 93
F.3d 86, 91 (2d Cir. 1996).  In addition, "[t]hat there are
constitutional limitations on the use of deadly force during the
course of an arrest is also clearly established."  <u>Id.</u> (citing
<u>Graham v. Connor</u>, 490 U.S. 386, 395-96 (1989)).  Accordingly,
whether an officer will be liable in a deadly force case "depends
on an assessment of the objective reasonableness of the belief
that his conduct did not violate [the decedent's] right to be
free of excessive force."  <u>Id.</u>  In light of my decision on the
merits, I need not reach the qualified immunity defense.

whether this evidence could convince a rational factfinder that the officer acted unreasonably.'" Id. (quoting Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)).

(b) **Application**

It is clear that Lee stabbed Baumeister outside Rory Dolan's on January 4, 2006.[13] A stabbing constitutes deadly force, and therefore Ingram's shooting of Lee would not be excessive if it was performed to prevent such deadly force. Plaintiff's only hope of surviving defendants' motion with respect to her excessive force claim is to argue that Defendant Officers engaged in unprovoked deadly force before the stabbing, and that Lee's stabbing of Baumeister was in self-defense. Plaintiff so argues: "it was the 3 defendant officers who aggressively accosted Peter Lee and to the extent that Peter Lee responded with any physical force it was to defend himself against what he perceived was an imminent deadly threat." (Pl.'s Response to NYC 56.1 Statement ¶ 56).

Plaintiff has failed, however, to produce any evidence from which a reasonable jury could conclude that the officers

_____

[13] Defendants present ample evidence that Lee stabbed Baumeister. Plaintiff does not seriously dispute this fact, and, in any event, plaintiff presents no evidence to contradict it.

were the aggressors, let alone that they employed deadly force prior to the stabbing. I am mindful of the Second Circuit's warnings regarding the "difficult problem" facing plaintiffs in deadly force cases: the unavailability of the individual most likely to contradict the officer's testimony. O'Bert, 331 F.3d at 37. This case, however, does not involve the proverbial officer and suspect in an isolated, dark alley. No fewer than nine people -- police officers Baumeister, Roughneen, and Ingram; bartenders Slattery and Hughes; and bar patrons McAllister, Castaldo, Cassidy, and Ronan -- witnessed the events outside Rory Dolan's in the early-morning hours of January 4, 2006. None of them describes the Defendant Officers as employing deadly force prior to Lee's stabbing of Baumeister.

In opposing summary judgment, plaintiff relies heavily on the surveillance footage from Rory Dolan's. While the Video does show the Defendant Officers closely following Lee, Castaldo, and McAllister as they exit bar area and enter the vestibule, those six individuals exit the cameras' field of view just before the critical moment: the physical altercation that began in the vestibule. The cameras also do not capture the events that occur on the sidewalk and street in front of Rory Dolan's. The footage shows the Defendant Officers walking towards Lee, Castaldo, and

- 22 -

McAllister as they are exiting through the vestibule.  It does not show any act of physical violence.  Accordingly, the surveillance footage of the Defendant Officers' demeanor prior to entering the vestibule is insufficient to create a genuine issue of fact as to whether the Defendant Officers employed the deadly force that could have justified Lee stabbing Baumeister.

Plaintiff also points to several inconsistencies between the accounts of the witnesses and the Video, presumably reasoning that these inconsistencies raise an issue of fact with respect to the use of excessive force.  In a deadly force case, this Court must "consider 'circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably.'"  O'Bert, 331 F.3d at 37 (quoting Scott, 39 F.3d at 915).  Plaintiff emphasizes two inconsistencies between the Video and witness testimony: Castaldo's account that Lee showed him a knife while they were in the bathroom together and the claim of several witnesses that the Defendant Officers followed Lee and Castaldo outside to protect Slattery, one of the bartenders.

Both in his statement to a Yonkers detective on January 4, 2006, and in his deposition, Castaldo claims that while he was

- 23 -

in the bathroom with Lee, Lee "lifted his shirt and showed
[Castaldo] a knife that he was carrying."  (Castaldo Dep. 15:7-9;
see Castaldo Statement 2 (stating, Lee "lifted up his shirt and I
saw that he had a knife in his waistband")).  In the Video,
however -- with the exception of a few very brief moments when
Lee is walking around the front or back of the bar -- Lee remains
in the main bar area within the view of the surveillance cameras
from his entry into Rory Dolan's, (Video 12:28:25), to his exit
through the vestibule, (Video 12:46:33).  Based on the Video,
Castaldo's account is dubious, at least as to the location of the
purported knife brandishing.  Plaintiff, however, fails to
explain how this inconsistency could create a triable issue of
fact with respect to the use of excessive force.  Even assuming
that Lee never showed Castaldo his knife, it is undisputed that
Baumeister was stabbed on January 4 and a bloody knife was
recovered near Lee's body.  Indeed, it is clear that Lee stabbed
Baumeister.  Under these circumstances, the inconsistency between
Castaldo's account and the Video is not sufficient to raise a
genuine issue of material fact.

　　　　In response to defendants' claims that Baumeister,
Roughneen, and Ingram followed Lee and Castaldo outside to
protect Slattery, plaintiff claims, based on the Video, that

- 24 -

"both Rory Dolan bartenders were . . . behind the bar at all times as Peter Lee and Michael Castaldo were voluntarily leaving the bar." (Pl.'s Response to NYC 56.1 Statement ¶ 36). Plaintiff essentially argues that such an inconsistency would "tend to discredit the police officer's story." O'Bert, 331 F.3d at 37. Plaintiff is correct that when the Defendant Officers first approached Lee and Castaldo, both bartenders were behind the rectangular bar. (Video 12:46:25-33). The Defendant Officers and Lee's party, however, disappear from the Video frame prior to entering the vestibule. (Video 12:46:25). Shortly thereafter, Slattery comes running toward the vestibule. (Video 12:46:36-41). As the New York City Defendants point out, "[t]he [V]ideo does not reflect who entered the vestibule when, who exited the premises when, or whether the officers left the premises before or after the bartenders." (NYC Reply Mem. 7). Thus, the Video is not inconsistent with the Defendant Officers' proffered rationale for following Lee outside of the bar area of Rory Dolan's.

Because plaintiff has failed to present evidence sufficient to create a triable issue of material fact with

respect to her excessive force claim, summary judgment is granted in this respect.[14]

## 2. Assault and Battery Claim

Defendants argue that summary judgment should be granted on Henry-Lee's state assault and battery claims because Ingram acted in self-defense and in defense of Baumeister when he shot Lee. As with the excessive force claim, plaintiff claims that the Defendant Officers unjustifiably accosted Lee, and fabricated a rationale for doing so.

### (a) Applicable Law

To prove a New York civil battery claim against a police officer, a plaintiff must prove that the officer made "'bodily contact, that the contact was offensive, and that [the officer] intended to make the contact.'" Nimely, 414 F.3d at 391

---

[14] In plaintiff's second cause of action, she purports to assert a claim for the negligent and/or reckless shooting of Lee. Under New York law, however, where the evidence establishes that an injury was caused intentionally, a claim for negligence must be dismissed. Sylvester v. City of New York, 385 F. Supp. 2d 431, 438 (S.D.N.Y. 2005) (citing Mazzaferro v. Albany Motel Enter., Inc., 515 N.Y.S.2d 631, 632-33 (3d Dep't 1987); Masters v. Becker, 254 N.Y.S.2d 633, 634-35 (2d Dep't 1964)). Here, it is undisputed that Ingram acted intentionally in shooting Lee. (NYC 56.1 Statement ¶¶ 64-69; Pl.'s Response to NYC 56.1 Statement ¶¶ 66-69 (stating that the Defendant Officers "aggressively accosted" Lee)). Accordingly, plaintiff's negligence claim is dismissed.

(quoting Laurie Marie M. v. Jeffrey T. M., 559 N.Y.S.2d 336 (2d Dep't 1990)).  Additionally, for a plaintiff to succeed in a battery action, the officer's conduct must not fall within the protection of New York Penal Law § 35.30, which provides that a police officer may employ deadly force when "the use of deadly physical force is necessary to defend the police officer . . . or another person from what the officer reasonably believes to be the use or imminent use of deadly physical force."  N.Y. Penal Law § 35.30(1); see Nimely, 414 F.3d at 391 (citing Brunelle v. City of New York, 702 N.Y.S.2d 648 (2d Dep't 2000)).

   (b)   **Application**

As discussed above, on this record a reasonable jury could only find that Ingram shot Lee after Lee stabbed Baumeister.  Thus, only if Lee was privileged to use deadly force in self-defense would Ingram be liable for a civil battery for shooting Lee.  Lee, however, has not produced sufficient evidence for a reasonable jury to conclude that Lee was responding to a perceived deadly threat when he stabbed Baumeister.  Accordingly, summary judgment is granted for the Defendant Officers with respect to plaintiff's battery claims.

- 27 -

3. **Negligent Failure to Intervene to Prevent JMR from Serving Lee**

As to the claim for negligent failure to intervene to prevent Rory Dolan's bartenders from serving alcohol to Lee, the New York City Defendants argue that they had no duty to intervene because no special relationship existed between Lee and the City of New York and because the incident occurred outside the boundaries of the City of New York. Plaintiff responds that the New York City Defendants had a special duty to prevent the service of Lee because they violated a statutory duty enacted for the benefit of a particular class of persons -- specifically the duty embodied in the National Minimum Drinking Age Act, 23 U.S.C. § 158, and New York Alcoholic Beverage Control Law § 65. Plaintiff further argues that the Yonkers location of Lee's death does not preclude liability because the Defendant Officers were involved in "police action."

(a) **Applicable Law**

Under New York law, a municipality "is not liable for the negligent performance of a governmental function unless there existed 'a special duty to the injured person, in contrast to a general duty owed to the public.'" McLean v. City of New York, 12 N.Y.3d 194, 199 (2009) (quoting Garrett v. Holiday Inns, Inc.,

- 28 -

58 N.Y.2d 253, 261 (1983)).  Such a special duty arises when

there exists a special relationship between the governmental

entity and the plaintiff.  Id.  A special relationship exists in

three circumstances: "'(1) when the municipality violates a

statutory duty enacted for the benefit of a particular class of

persons; (2) when it voluntarily assumes a duty that generates

justifiable reliance by the person who benefits from the duty; or

(3) when the municipality assumes positive direction and control

in the face of a known, blatant and dangerous safety violation.'"

Id. (quoting Pelaez v. Seide, 2 N.Y.3d 186, 199 (2004)).

     (b)  **Application**

     Plaintiff argues that the first category of special

relationship -- a relationship formed when a municipality

violates a statutory duty enacted for the benefit of a particular

class of persons -- applies in this case.  Specifically,

plaintiff cites New York's Alcoholic Beverage Control Law and the

National Minimum Drinking Age Act.

     Alcoholic Beverage Control Law § 65 prohibits sales of

alcohol to "[a]ny person, actually or apparently, under the age

of twenty-one years."  N.Y. Alco. Bev. Cont. Law § 65.  "'To form

a special relationship through breach of a statutory duty, the

governing statute must authorize a private right of action.'"

McLean, 12 N.Y.3d at 200 (quoting Pelaez, 2 N.Y.3d at 200).
Section 65, however, "does not create a private right of action."
Sherman v. Robinson, 80 N.Y.2d 483, 487 (1992).  Thus, § 65 cannot
form the basis for a special duty to Lee.

The National Minimum Drinking Age Act authorizes the
Secretary of Transportation to withhold federal highway funds
from states with a minimum drinking age under twenty-one.  23
U.S.C. § 158.  It neither creates a minimum drinking age in the
State of New York nor creates an express or implied right of
action in an individual who is under 21.  See id.  Accordingly, §
158 cannot form the basis of "a statutory duty enacted for the
benefit of a particular class of persons."  Pelaez, 2 N.Y.3d at
199.

Plaintiff does not rely on the second or third
circumstance in which a special relationship can exist.  In
addition, plaintiff has put forth no evidence suggesting that the
City of New York or its officers voluntarily assumed "a duty that
generates justifiable reliance by the person who benefits from
the duty" or assumed "positive direction and control in the face
of a known, blatant and dangerous safety violation."
Accordingly, plaintiff's special-duty claims are dismissed.

- 30 -

### 4.  <u>Failure to Intercede to Protect Lee</u>

In her fourth cause of action, plaintiff claims that the Defendant Officers failed to intercede to prevent a deprivation of Lee's Fourth Amendment rights.[15]  Defendants argue that summary judgment should be granted with respect to Henry-Lee's failure to intercede claim because Lee's rights were not violated and because the Defendant Officers are protected by qualified immunity.  In addition, defendants reason that the failure to intercede claim against Baumeister should be dismissed because his stab wounds deprived him of a "realistic opportunity" to intercede.  Plaintiff argues that there is "no evidence in the record that any of the defendant officers even attempted to intervene on behalf of Peter Lee since they were all involved in chasing to catch and kill him."  (Pl.'s Mem. 10).

_____

[15]  Plaintiff's fourth cause of action also appears to assert that NYPD officers other than Defendant Officers were present at Rory Dolan's on the night of January 3, 2006, and negligently failed to intervene.  (Am. Compl. at 123) (stating that while the three Defendant Officers "continued to escalate the altercation with plaintiff's decedent by verbally abusing him, threatening him and thereafter viciously attacking and battering him, the other officers associated with defendant New York Police Department failed to intervene").  Plaintiff cites no evidence that other NYPD officers were at Rory Dolan's, and this Court's review of the record has not revealed any such evidence. Accordingly, to the extent that plaintiff asserts such a claim, summary judgment is granted.

(a)   **Applicable Law**

A police officer "has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988).  Accordingly, an officer may be liable under § 1983 if he fails to intercede to prevent the unconstitutional conduct of his fellow officers. Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 129 (2d Cir. 1997).

Even where an officer fails to intercede on behalf of a citizen whose rights are being violated, he may escape liability if he did not have a realistic opportunity to intercede.  See O'Neill, 839 F.2d at 11-12 (granting summary judgment for defendant officer on failure to intercede claim where "[t]he three blows [constituting excessive force] were struck in such rapid succession that [the defendant officer] had no realistic opportunity to attempt to prevent them").  The constitutional violation must be of "sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator."  Id.  When considering whether an officer had a realistic opportunity to intercede, a court should consider whether the officer witnessed prior unconstitutional

- 32 -

conduct that would alert him to a likelihood of further unconstitutional conduct.  See id. (noting that the officer, having seen a prisoner beaten, "was alerted to the need to protect [him] from further abuse.").

      **(b)**  **Application**

      An underlying constitutional violation is an essential element of a failure to intercede claim under § 1983.  See Ricciuti, 124 F.3d at 129.  Thus, on a defendant's motion for summary judgment, if there is no genuine issue of material fact regarding whether a constitutional violation occurred, a court must grant summary judgment on a claim that the defendant officers failed to intercede in the alleged constitutional violation.  See id.  Here, as discussed above, because I conclude that there is no genuine issue of material fact as to plaintiff's excessive force claim, summary judgment must be granted for defendants on plaintiff's failure to intercede claims.

    **5.**  **Negligent Hiring, Training, Supervision, and Retention**

      In her fifth cause of action, plaintiff alleges that the City of New York was negligent in hiring, training, retaining, and supervising Baumeister, Ingram, and Roughneen. Defendants move for summary judgment, arguing that plaintiff has adduced "no evidence" in discovery to support such a claim.  In

response, plaintiff states that Roughneen and Baumeister have "a known history involving excessive force."

To prevail on a claim for negligent hiring, training, supervision, or retention, a plaintiff must prove that a municipality's failure to properly train, hire, retain, or supervise "its police officers in a relevant respect evidences a deliberate indifference to the rights of its inhabitants." Jackson v. City of New York, 596 N.Y.S.2d 457, 458 (2d Dep't 1993) (citing Canton v. Harris, 489 U.S. 378, 389-90 (1989)).   On a motion for summary judgment, the plaintiff bears the burden of presenting evidence pertaining to the training, hiring, retention, or supervision policies of the municipality.   Here, plaintiff has not carried this burden.   Although the plaintiff asked some isolated deposition questions regarding past instances of misconduct on the part of Baumeister and Roughneen, the current record is insufficient to permit a reasonable jury to conclude that the City of New York negligently retained the officers in "deliberate indifference to the rights of its inhabitants."   Id.

In addition, even if plaintiff had presented evidence to expose a breach on the part of the City of New York, plaintiff has not raised a material issue of fact as to causation.   As

discussed above, because I conclude that there is no genuine
issue of material fact regarding whether Lee was the aggressor,
any breach in the hiring, retention, training, or supervision of
the Defendant Officers did not cause Lee's injury.  Accordingly,
summary judgment is granted for the City of New York on
plaintiff's negligent hiring, retention, training, and
supervision claim.

        6. **Monell Claim**

        Plaintiff's fourteenth and fifteenth causes of action
assert Monell claims against the City of New York based on the
City's custom or practice of "arming their off-duty agents . . .
with department issued weapons; allowing their off-duty agents to
carry firearms to bars where there was a likelihood that said
officers would consume alcoholic beverages and become
intoxicated; [and] not prohibiting their officers from ingesting
alcoholic beverages while armed."  (Pl.'s Compl. ¶ 255).  The
City of New York moves for summary judgment, arguing (1) that the
Defendant Officers did not violate Lee's constitutional rights
and (2) that plaintiff has not conducted discovery on the issue
of the City's custom or practice.  In response, plaintiff cites a
section of the NYPD Police Department Patrol Guide relating to
NYPD off-duty weapon policies.

- 35 -

(a)   <u>Applicable Law</u>

Under <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978), a municipality is subject to liability for damages under § 1983 when an official municipal policy or custom contributes to a constitutional deprivation.  "[W]hen execution of a government's policy or custom . . . inflicts [an] injury . . . the government as an entity is responsible under § 1983."  <u>Id.</u> at 694.  The "policy or custom" requirement "is intended simply to distinguish acts of the municipality from acts of its employees, in order that municipal liability be limited to conduct for which the municipality is actually responsible."  <u>Dangler v. N.Y.C. Off Track Betting Corp.</u>, 193 F.3d 130, 142 (2d Cir. 1999) (citing <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 478-80 (1986)).

Under Second Circuit case law, a prerequisite to municipal liability under <u>Monell</u> is an underlying constitutional violation by a state actor.  "<u>Monell</u> does not provide a separate cause of action for the failure by the government to train its employees; it <u>extends</u> liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."  <u>Segal v. City of New York</u>, 459 F.3d 207, 219 (2d Cir. 2006) (emphasis in original).  Once a "district court

- 36 -

properly [finds] no underlying constitutional violation, its decision not to address the municipal defendants' liability under Monell [is] entirely correct." Id.

### (b)  Application

Here, plaintiff's Monell claim cannot survive summary judgment.  Because a constitutional violation by a municipal employee is a necessary prerequisite to municipal liability under Monell, a court granting summary judgment for the defendants on the underlying constitutional claim must also grant summary judgment on the associated Monell claim.  See id.  Because I grant summary judgment for the defendants on plaintiff's excessive force claim, the City of New York's motion for summary judgment is granted as to plaintiff's Monell claim.

## C.  Claims Against JMR

Henry-Lee alleges that JMR violated New York State Dram Shop Laws by serving alcohol to Lee, Baumeister, Ingram, and Roughneen.  Further, Lee alleges that JMR was negligent in its security.  JMR moves for summary judgment dismissing both claims. For the reasons set forth below, JMR's motion for summary judgment is granted.

### 1.  Dram Shop Liability Claim

As to the Dram Shop claim, JMR argues that (1) there is

no evidence in the record that Baumeister, Ingram, or Roughneen were intoxicated or impaired on January 4, 2006; (2) an estate cannot recover for damages sustained to an underage consumer of alcohol; (3) there is no evidence in the record that Lee was intoxicated on January 4, 2006; (4) Lee's alleged intoxication was not the cause of his injuries; and (5) there is no evidence in the record that Lee bought alcohol from, or was directly served alcohol by, JMR.

Plaintiff responds that (1) JMR's bartenders served Lee alcohol despite the fact that he was and appeared to be under the age of 21; (2) triable issues of fact exist as to whether JMR over-served Defendant Officers with alcohol, causing them to become inebriated, which then prompted them to attack Lee; (3) JMR negligently failed to secure its premises despite the foreseeability of the events culminating in Lee's death; and (4) plaintiff's claim for punitive damages should be sustained because JMR was reckless.[16]

Because plaintiff has not demonstrated a triable issue of fact as to whether Baumeister, Ingram, and Roughneen were

---

[16]   Plaintiff further contends that JMR's motion should be denied because it suppressed discovery necessary for the proper prosecution of the case.  This argument is rejected for the reasons discussed below.

intoxicated, JMR's motion for summary judgment on plaintiff's dram shop liability claim is granted.

### (a)  Applicable Law

Under New York's General Obligations Law § 11-101, commonly known as the "Dram Shop Act," "[a]ny person who shall be injured . . . by reason of the intoxication of any person . . . shall have a right of action against any person who shall, by unlawful selling to or unlawfully assisting in procuring liquor for such intoxicated person, have caused or contributed to such intoxication."  New York Alcoholic Beverage Control Law § 65 makes it unlawful for any person to sell alcoholic beverages to "[a]ny person, actually or apparently, under the age of twenty-one years" or a "visibly intoxicated person." N.Y. Alco. Bev. Cont. § 65.

To survive a motion for summary judgment on a dram shop claim, a plaintiff must demonstrate an issue of material fact as to whether "(1) Defendant sold an alcoholic beverage to Assailant at a time when Assailant was visibly intoxicated; (2) the sale of alcohol caused or contributed to Assailant's intoxication; and (3) there is some reasonable connection between the unlawful sale and Plaintiff['s] injury." Marotta v. Palm Mgmt. Corp., No. 05 Civ. 10688, 2010 U.S. Dist. LEXIS 30385, at *5-6 (S.D.N.Y. Mar.

- 39 -

22, 2010) (citing <u>McNeill v. Rugby Joe's, Inc.</u>, 751 N.Y.S.2d 241 (2d Dep't 2002)).  Only a "reasonable connection" between the unlawful sale and the injury is required; plaintiff need not demonstrate proximate cause.  <u>Id.</u>  Plaintiff must demonstrate, however, that "the party to whom liquor was sold acted or appeared to be intoxicated at the time of the sale."  <u>Nehme v. Joseph</u>, 554 N.Y.S.2d 642, 643 (2d Dep't 1990); <u>see also</u> <u>Marconi v. Reilly</u>, 678 N.Y.S.2d 785, 786 (2d Dep't 1998).

      **(b)**  **Application**

      Plaintiff does not present any evidence demonstrating that Baumeister, Ingram, or Roughneen were or appeared to be intoxicated at the time they were sold alcohol.  Plaintiff points only to the fact that the officers, in a fifty-minute window, each ordered two drinks, with two of them ordering vodka-cranberry cocktails, and one of them ordering two light beers. (Ingram Dep. 14-15 (testifying to ordering two cranberry-vodka cocktails and not finishing the second); Baumeister Dep. 81, 332-33 (testifying to ordering two beers and drinking only one of them); Roughneen Dep. 120 (testifying to ordering a glass of water and then two cranberry-vodka cocktails)).  In response, JMR notes the following:  (1) Roughneen is 6'1" and weighed more than 250 pounds on the night in question (Roughneen Dep. 297-98); (2)

two of the officers testified that, while they could not recall

what they ate that night for dinner, they always ate dinner on

the job (Roughneen Dep. 297-98; Baumeister Dep. 331); (3) all of

the officers testified that they did not drink any alcohol prior

to arriving at Rory Dolan's (Roughneen Dep. 294; Baumeister Dep.

331; Ingram Dep. 15); (4) Roughneen and Baumeister testified

that, at no point during the evening in question, were they

intoxicated (Roughneen Dep. 294; Baumeister Dep. 332-33); and (5)

Baumeister testified that at no point in the evening did Ingram

appear intoxicated (Baumeister Dep. 336).  A reasonable jury

could not conclude based on plaintiff's evidence of the Defendant

Officers' drink orders that they were visibly intoxicated upon

being served their second drink.  Plaintiff fails to ground her

claim in any testimonial evidence of the officers' alleged

intoxicated state, circumstantial evidence such as blood alcohol

tests, or expert testimony.  See Romano v. Stanley, 90 N.Y.2d

444, 449 (1997) (describing the types of evidence admissible to

demonstrate "intoxication" for dram shop liability).  There is

simply no factual basis for plaintiff's claim.[17]

---

[17]  I reject plaintiff's suggestion that her lack of
evidence is due to failure on JMR's part to produce requested
documents.  See infra.

- 41 -

Further, to the extent that plaintiff asserts a dram shop liability claim against JMR for serving Lee alcohol while he was underage, this argument is rejected. To demonstrate dram shop liability, plaintiff must allege a reasonable connection between Lee's intoxication and his death. McNeill, 751 N.Y.S.2d at 394. Plaintiff, however, expressly disavows any such connection. Indeed, plaintiff explicitly states that Peter Lee's intoxication did not cause his death and did not "set into motion the events that culminated" in his death. (Pl.'s Opp'n Mot. 9).

Finally, plaintiff appears to assert a direct claim under Alcoholic Beverage Control Law § 65. Plaintiff asserts that she is entitled to summary judgment "on account that JMR's bartenders admitted to having served Peter Lee with alcohol despite the fact that he was under 21 years old, in direct contravention of New York State law." (Pl.'s Opp'n Mot. 7). Section 65 prohibits the sale of alcohol to any person "actually or apparently[] under the age of twenty-one years." N.Y. Alco. Bev. Cont. Law § 65. New York courts, however, have found that the law does not afford a private right of action to individuals. Sherman v. Robinson, 80 N.Y.2d 483, 487 (1992); Johnson v. Verona Oil, Inc., 827 N.Y.S.2d 747, 749 n.1 (3d Dep't 2007); Moyer v. Lo Jim Cafe, Inc., 240 N.Y.S.2d 277, 278 (1st Dep't 1963).

- 42 -

Accordingly, I need not address whether JMR did in fact breach §
65.  To the extent plaintiff attempts to assert a claim under New
York's Beverage Control Law, it is dismissed.

### 2. Negligent Security Claim

As to the negligence claims, JMR argues that (1) JMR
did not owe Lee a duty to protect him from harms on the sidewalk
or street; (2) it was not foreseeable that a stabbing would occur
at 3:00 a.m. on a Wednesday; (3) JMR acted with reasonable care;
and (4) the proximate cause of Lee's death was his decision to
stab Baumeister.

Plaintiff responds that (1) it was reasonably
foreseeable to JMR that third persons would endanger the safety
of individuals on JMR's premises; (2) JMR had a duty to protect
Lee against this reasonably foreseeable harm; and (3) JMR
breached that duty by providing inadequate security.  Plaintiff
further asserts that JMR's motion should be denied because JMR
suppressed the necessary discovery discussed above.

### (a) Applicable Law

To establish a claim of negligence, a plaintiff must
demonstrate (1) the existence of a duty owed to him or her by the
defendant, (2) a breach of that duty, and (3) injury resulting
from the breach.  Solomon v. City of New York, 66 N.Y.S.2d 1026,

1027 (1985).  An owner or occupier of land has a legal duty to exercise reasonable care under the circumstances to maintain his or her premises in a reasonably safe condition.  Kush v. City of Buffalo, 462 N.Y.S.2d 831, 833 (1983); Basso v. Miller, 386 N.Y.S.2d 564, 568 (1976).  That duty includes taking minimal precautions to protect members of the public from reasonably foreseeable criminal acts of third parties.  Evans v. 141 Condominium Corp., 685 N.Y.S.2d 191, 193 (1st Dep't 1999).

A possessor of real property is not an insurer of the safety of those who enter onto his premises, however, and to establish the existence of a duty on his or her part to take minimal protective measures, "it must be shown that he [or she] either knows or has reason to know from past experience 'that there is a likelihood of conduct on the part of third persons . . . which is likely to endanger the safety of the visitor.'"  Iannelli v. Powers, 498 N.Y.S.2d 377 (2d Dep't 1986) (quoting Nallan v. Helmsley-Spear, Inc., 429 N.Y.S.2d 606, 613 (1980)).  Indeed, this is the case even where "there is an extensive history of criminal conduct on the premises."  Id. at 380.

The New York Court of Appeals has recognized that a history of criminal activity in and around the area in which the

- 44 -

plaintiff is injured can give rise to a duty on the part of the owner or possessor of premises to take reasonable steps to minimize the danger to persons visiting the premises.  See Nallan, 429 N.Y.S.2d at 613-14; see also Maysonet v. KFC, Nat'l Mgmt. Co., 906 F.2d 929, 931 (2d Cir. 1990).  Where there is evidence that the possessor of land had knowledge of prior criminal activities on his or her premises, whether such knowledge "is sufficient to make an injury to a plaintiff foreseeable to an owner or possessor of land 'must depend on the location, nature and extent of those previous criminal activities and their similarity, proximity or other relationship to the crime in question.'"  Lauersdorf v. Supermarket Gen. Corp., 657 N.Y.S.2d 732, 733 (2d Dep't 1997) (quoting Jacqueline S. v. City of New York, 598 N.Y.S.2d 160, 163 (1993)).  "The criminal act of a third person may also be reasonably foreseeable -- thereby casting the owner of the premises in liability towards invitees -- if the third person acts in such a manner that an ordinarily prudent person would believe he poses a risk of harm."  Maysonet, 906 F.2d at 931 (citing D'Amico v. Christie, 71 N.Y.2d 76, 85 (1987); Huyler v. Rose, 451 N.Y.S.2d 478, 478 (4th Dep't 1982)); see also Marotta v. Palm Mgmt. Corp., No. 05 Civ. 10688, 2010

- 45 -

U.S. Dist. LEXIS 30385 (S.D.N.Y. Mar. 22, 2010); <u>Shank v. Riker</u>
<u>Restaurants Assocs., Inc.</u>, 216 N.Y.S.2d 118, 120 (N.Y. Sup. Ct.
1961).

Once a plaintiff establishes that a duty exists, she
must then demonstrate that the defendant breached that duty by
failing to provide minimal precautions against the foreseeable
criminal acts of third parties, and that the breach was a
proximate cause of her injuries.  <u>See</u> <u>Burgos v. Aqueduct Realty</u>
<u>Corp.</u>, 684 N.Y.S.2d 139, 140 (1998).  In premises security cases,
"the question of what safety precautions may reasonably be
required of the possessor of realty is generally a question of
fact to be determined by the jury, taking into account such
factors as, <u>inter alia</u>, the seriousness of the risk, the severity
of potential injuries and the cost or burden imposed on the
possessor by reason of each such precautionary measure."
<u>Iannelli</u>, 498 N.Y.S.2d at 381-82.  "'This is not to say, however,
that in every case involving a landowner's liability in
negligence the question whether reasonable care was exercised
must be determined by the jury. . . .  Only in those cases where
there arises a real question as to the landowner's negligence
should the jury be permitted to proceed.  In all others, where
proof of any essential element falls short, the case should go no

- 46 -

further.'"  <u>Kazanoff v. United States</u>, 945 F.2d 32, 39 (2d Cir.

1991) (quoting <u>Akins v. Glens Falls City Sch. Dist.</u>, 53 N.Y.2d

325, 332 (1981)) (alterations in original).

  "Under New York law when the actions of a third person

or the plaintiff intervene between the defendant's conduct and

the injury, the defendant is liable in negligence only when the

intervening acts are a normal and foreseeable consequence of

defendant's conduct.  Conversely, where the plaintiff's

intervening actions are not a normal and foreseeable consequence

of the defendant's conduct, the plaintiff's conduct becomes a

superseding cause which absolves the defendant of liability."

<u>Caraballo v. United States</u>, 830 F.2d 19, 22 (2d Cir. 1987)

(citations omitted); <u>see also</u> <u>Maysonet</u>, 906 F.2d at 932.  A

plaintiff's own conduct, "demonstrating a lack of reasonable

regard for his own safety" can serve as an intervening cause

absolving the defendant of liability.  <u>Ruggerio v. Bd. of Educ.</u>,

298 N.Y.S.2d 149, 149 (4th Dep't 1969) (granting summary judgment

for defendants on failure to supervise claim because plaintiff

voluntarily engaged in physical altercation that led to his

injury); <u>see also</u> <u>Benitez v. Paxton Realty Corp.</u>, 637 N.Y.S.2d

11, 12 (1st Dep't 1996) (plaintiff's opening of door after dark

without first checking peephole to see who was at the door was

- 47 -

intervening cause of criminal act); <u>Elie v. Kraus</u>, 631 N.Y.S.2d 16, 18 (1st Dep't 1995) (same).

(b) <u>**Application**</u>

Plaintiff argues that Rory Dolan's had a history of criminal activity that gave rise to a duty to provide security. To prove the history of criminal activity at Rory Dolan's, plaintiff relies on (1) the Yonkers Police Department's Rory Dolan's premises history report and (2) the Yonkers Police Department's file of written reports relating to police responses to Rory Dolan's. This evidence is briefly described below.

First, plaintiff relies on the Rory Dolan's premises history report produced by the Yonkers Police Department ("YPD"). This report is a spreadsheet of 804 police-response entries as relayed to the Yonkers Police Department dispatcher by patrol officers. The responses cover a ten-year period, ranging from January 14, 1996, to December 13, 2005. The entries all list the address of Rory Dolan's as the "Location," and each entry has a "call" code that corresponds to a particular type of crime or response. Although the address is listed for every entry, this does not necessarily mean that each entry denotes a response to Rory Dolan's. As Sergeant Boch -- a YPD patrol supervisor for three years -- testified in his deposition, because Rory Dolan's

- 48 -

is a familiar landmark, many officers call in Rory Dolan's as the "Location" even if the police response is unrelated to Rory Dolan's. As Sergeant Boch put it, "It's a lot easier for me to give a reference point [that] everybody in the precinct might know, than to memorialize that one location is, for example, 123 McLean Avenue." (Boch Dep. 73-74). For example, some entries include the "call" code "MVMV," which refers to a motor vehicle accident; the vast majority of these likely had nothing to do with Rory Dolan's.

Plaintiff also relies on the YPD's file containing a series of written reports describing incidents that occurred in or near Rory Dolan's. In the two years prior to the shooting of Lee, the following are the incidents involving violence in or near Rory Dolan's: on July 29, 2005, an unknown man was struck in the face with a pint glass in front of Rory Dolan's; on October 31, 2004, a bar patron threw a beer bottle at the head of a bouncer; on October 24, 2004, a patron was struck in the head with a beer bottle on the Rory Dolan's dance floor; on January 1, 2004, a bouncer was threatened by a man with a knife on the dance floor; on May 16, 2004, a woman was assaulted with a closed fist and a beer bottle outside the Rory Dolan's bathrooms; on July 23, 2004, a patron was struck in the head with a glass inside Rory

- 49 -

Dolan's; on July 9, 2004, a patron threw a beer bottle at the head of another patron; on July 4, 2005, a fight broke out on the Rory Dolan's dance floor during which one of the suspects tried to take a police officer's weapon; on June 25, 2004, a patron was stabbed by an unknown person in Rory Dolan's; and, on August 6, 2004, a patron was kicked out of Rory Dolan's and, while in front of the bar, became unruly, was arrested, and punched the arresting officer.  Significantly, none of these incidents occurred on a Monday, Tuesday, or Wednesday night, and none involved a shooting.

        Whether a history of criminal activity on a premises gives rise to a duty to provide security depends upon "'the location, nature and extent of those previous criminal activities and their similarity, proximity or other relationship to the crime in question.'"  Lauersdorf, 657 N.Y.S.2d at 733 (quoting Jacqueline S., 598 N.Y.S.2d at 163).  Here, although JMR was arguably on notice of prior criminal activities on its premises and in the area, these prior incidents were not sufficiently similar to the crime in question to make Lee's death reasonably foreseeable.  See Browne v. GMRI, Inc., 775 N.Y.S.2d 184, 184 (2d Dep't 2004) (holding that fistfights were too dissimilar to a shooting to make a shooting foreseeable); Lauersdorf, 657

- 50 -

N.Y.S.2d at 733.   Thus, because the manner of Lee's death was not
reasonably foreseeable, JMR did not have a duty to provide
security capable of preventing his death.

        This conclusion is bolstered by a pattern in the timing
of the ten violent incidents listed above: all of the incidents
occurred during the busiest times at Rory Dolan's, Thursday night
through early Monday morning.  (See Dolan Dep. 23).  The record
supports JMR's contention that its need for security -- and its
duty to provide security -- were substantially greater on the
busy days than on the slow days.  Indeed, to the extent that
violent activity on a Thursday through Sunday or holiday night
was foreseeable, JMR took the very reasonable approach of
employing extra security on those nights.  (JMR Mot. Ex. J).

        Even assuming there is an issue of fact as to whether
JMR should have provided security, for the plaintiff's negligent
security claims to survive summary judgment, there must be
sufficient evidence in the record to create a genuine issue of
material fact as to proximate causation.  Where a plaintiff
demonstrates "a lack of reasonable regard for his own safety,"
the defendant's conduct can serve as an intervening cause,
cutting the chain of causation and absolving the defendant of
liability.  Ruggerio, 298 N.Y.S.2d at 150.  Here, it is

- 51 -

undisputed the Lee stabbed Baumeister; the plaintiff has not

produced evidence sufficient to create a genuine issue of fact as

to whether Lee was responding to a deadly threat when he stabbed

Baumeister.  Thus, when Lee stabbed Baumeister, he demonstrated

"a lack of reasonable regard for his own safety," thereby cutting

the chain of causation between the security practices of JMR and

Lee's death.  Accordingly, JMR's motion for summary judgment on

plaintiff's negligent security claim is granted.

### 3.  **Punitive Damages**

Because I grant summary judgment on the above claims

against JMR, plaintiff may not recover punitive damages from JMR.

## D.  **Claims Against the City of Yonkers**[18]

### 1.  **Failure to Intervene**

Plaintiff's first and eleventh causes of action allege

that YPD officers were present in Rory Dolan's at or immediately

before Lee's shooting and failed to intervene to prevent it.

Plaintiff's tenth cause of action claims that YPD officers failed

---

[18]  Plaintiff names the "City of Yonkers Police Department"
as a defendant in the complaint.  Under New York law, however, "a
department of a municipal entity is merely a subdivision of the
municipality and has no separate legal existence."  Hoisington v.
County of Sullivan, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999).
Thus, the YPD is not a separate legal entity capable of being
sued, and I assume the claims are asserted against the City of
Yonkers.

to intervene to prevent JMR's agents from serving Lee.  Plaintiff has failed to produce any evidence whatsoever to support these claims -- or, for that matter, any evidence that YPD officers were in or near Rory Dolan's before Ingram shot Lee. Accordingly, summary judgment is granted with respect to plaintiff's first and eleventh causes of action.

### 2.  Witness Intimidation

Plaintiff's twelfth cause of action alleges that YPD officers falsely arrested, intimidated, detained, and tortured witnesses with the purpose of interfering with the investigation of the incident.  Plaintiff has failed to produce any evidence to support this claim.  And while there are inconsistencies in Castaldo's version of events, a reasonable jury could not conclude that Castaldo was intimidated or tortured based on these inconsistencies alone.  Accordingly, summary judgment is granted with respect to plaintiff's twelfth cause of action.[19]

---

[19]  To the extent that plaintiff asserts a conspiracy claim against the City of Yonkers under § 1983, that claim must be dismissed.  When asserting a claim for conspiracy, a plaintiff must "provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end."  Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003).  Here, plaintiff has provided no such factual basis.

### 3. __Failure to Abate a Public Nuisance__

Plaintiff's ninth cause of action alleges that the City of Yonkers negligently failed to curtail and abate a public nuisance at Rory Dolan's.  Protecting "health and safety is one of municipal government's most important duties.  Since municipalities are run by human beings, they sometimes fail in that duty, with harmful, even catastrophic, consequences.  When that happens, as a general rule, the municipality is not required to pay damages to the person injured."  Laratro v. City of New York, 828 N.Y.S.2d 280 (2006).  Because plaintiff has neither cited a case nor presented facts that bring the instant case outside the scope of the general rule, plaintiff's public nuisance claim is dismissed.

### 4. __Negligent Hiring, Training, Retention, and Supervision__

Plaintiff's thirteenth cause of action alleges negligent hiring, retention, training, and supervision of its police officers.  Plaintiff has neither identified any Yonkers police officers nor presented any evidence that any Yonkers police officers were present at Rory Dolan's in the early-morning hours of January 4, 2006, prior to the death of her son.  Accordingly, even if plaintiff presented evidence of negligent hiring, retention, training, or supervision, she could not prove

- 54 -

that it contributed to her injury.  Thus, the City of Yonkers's motion for summary judgment with respect to plaintiff's negligent hiring, training, retention, and supervision claims is granted.

**E.   Plaintiff's Derivative Claim**

Plaintiff's seventeenth cause of action is a derivative claim on her own behalf for deprivation of support, voluntary assistance, loss of consortium, and other related claims. Because I grant summary judgment with respect to all of plaintiff's claims, plaintiff's seventeenth cause of action is dismissed.

**F.   Plaintiff's Request for Additional Discovery**

Plaintiff asks this Court to deny defendants' motions for summary judgment because, according to plaintiff, defendants have suppressed discovery necessary for the proper prosecution of the case.  For the following reasons, plaintiff's request for additional discovery is denied.

As an initial matter, plaintiff's request for additional discovery is inadequate on its face.  Pursuant to Rule 56(f) of the Federal Rules of Civil Procedure (FRCP), "[i]f a party opposing the motion [for summary judgment] shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . order a

- 55 -

continuance to enable . . . other discovery to be undertaken."
Fed. R. Civ. P. 56(f).  The party seeking additional discovery
must "file an affidavit explaining: (1) the information sought
and how it is to be obtained; (2) how a genuine issue of material
fact will be raised by that information; (3) what efforts the
affiant has made to obtain the information; and (4) why those
efforts were unsuccessful." Sage Realty Corp. v. Ins. Co. of N.
Am., 34 F.3d 124, 128 (2d Cir. 1994) (citation omitted).  "A
reference to Rule 56(f) and to the need for additional discovery
in a memorandum of law in opposition to a motion for summary
judgment is not an adequate substitute for a Rule 56(f)
affidavit[,] and the failure to file an affidavit under Rule
56(f) is itself sufficient grounds to reject a claim that the
opportunity for discovery was inadequate." Paddington Partners
v. Bouchard, 34 F.3d 1132, 1137 (2d Cir. 1994) (citations
omitted).  Here, plaintiff has neither submitted a Rule 56(f)
affidavit nor provided in her reply papers the information that
must be included in such an affidavit.  See Sage Realty Corp., 34
F.3d at 128.  Accordingly, plaintiff is not entitled to
additional discovery.

        Even if plaintiff had filed a proper 56(f) affidavit, I
would still deny plaintiff additional discovery.  The parties had

- 56 -

a full and fair opportunity to conduct discovery, and it is too
late for them to complain now.  In her papers, plaintiff
identifies certain items of discovery she claims defendants never
produced.  The vast majority of these items would not, in my
view, lead to evidence that could present a genuine issue of
fact.  Ingram's deposition testimony would be important, but
plaintiff forfeited her right to depose Ingram when her counsel
unilaterally announced the night before the scheduled deposition
that he was not attending and then failed to cooperate with
defense counsel in setting a new date, even after I issued an
order directing Ingram to be produced a second time.  Other
purportedly missing items were produced, and other items were not
in defendants' custody or control.

Accordingly, plaintiff's request for additional
discovery is denied.

<u>CONCLUSION</u>

For the foregoing reasons, defendants' motions for
summary judgment dismissing Henry-Lee's claims are granted in all
respects.  The Clerk of the Court shall enter judgment dismissing

the amended complaint.   The case shall be closed.

          SO ORDERED.

Dated:     New York, New York
            September 30, 2010

                              DENNY CHIN
                              United States Circuit Judge
                              Sitting By Designation

**APPEARANCES**


For Plaintiff:

                    THE ADAM OFFICE, P.C.
                         By:  Richard Adam, Esq.
                    275 Madison Avenue, Suite 1100
                    New York, NY  10016

For Defendants John Baumeister, Michael Ingram, Kevin Roughneen,
and The City of New York:

                    MICHAEL A. CARDOZO, ESQ.
                    Corporation Counsel of the City of New York
                         By:  Arthur G. Larkin, Esq.
                              Assistant Corporation Counsel
                    100 Church Street
                    New York, NY  10007

For Defendant City of Yonkers:

                    FRANK J. RUBINO, ESQ.
                    Corporation Counsel of the City of Yonkers
                         By:  Michael Levinson, Esq.
                              Associate Corporation Counsel
                    City Hall Room 300
                    Yonkers, NY  10701

For Defendant JMR Rest. Corp.:

                    MARKS, O'NEIL, O'BRIEN & COURTNEY, P.C.
                         By:  David S. Henry, Esq.
                    530 Saw Mill River Road
                    Elmsford, NY  10523